## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Hosea M.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | )     No. 18 CV 2926 |
| v. | ) |
| | )     Magistrate Judge Jeffrey I. Cummings |
| ANDREW SAUL, Commissioner | ) |
| of Social Security,[2] | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Hosea M. ("Claimant") brings a motion for summary judgment to reverse or remand the

final decision of the Commissioner of Social Security ("Commissioner") denying his claim for

Child's Disability Insurance Benefits ("CDIBs") and Supplemental Security Income ("SSI").

The Commissioner brings a cross-motion seeking to uphold the decision to deny benefits. The

parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28

U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).

For the reasons that follow, Claimant's motion for summary judgment (Dkt. 17) is denied and

the Commissioner's motion for summary judgment (Dkt. 25) is granted.

## I.     BACKGROUND

### A.     Procedural History

On September 3, 2014, Claimant (then 19-years old) filed for SSI, alleging disability

beginning July 1, 2014 (when he was 18) due to narcolepsy. (R. 15.) Claimant filed for CDIBs

---

[1]  In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name.

[2]  Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

on the same basis on October 17, 2014. (*Id*.) Claimant's applications were denied initially and upon reconsideration. (R. 66-115.) Claimant filed a timely request for a hearing, which was held on December 7, 2016 before an Administrative Law Judge ("ALJ"). (R. 32-65.) Claimant appeared with counsel and offered testimony at the hearing. A vocational expert and a medical expert also offered testimony.

On April 21, 2017, the ALJ issued a written decision denying Claimant's applications for benefits. (R. 15-26.) Claimant filed a timely request for review with the Appeals Council. (R. 199-200.) On February 21, 2018, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-4.) This action followed.

### B. Medical Evidence in the Administrative Record

Claimant seeks disability benefits for narcolepsy. The administrative record contains the following evidence that bears on Claimant's claim:

### 1. Evidence from Claimant's Treating Physicians

On May 12, 2014, at the age of 18, Claimant presented to nurse practitioner Linda Hushaw complaining of excessive daytime sleepiness. (R. 426-28.) Claimant reported that he had an accident after he fell asleep while driving the day before. (R. 426.) A physical examination yielded normal results. (R. 427.) Nurse Hushaw recommended that Claimant avoid driving or operating dangerous machinery and referred him for a sleep consultation. (R. 428.)

Claimant began treatment with pulmonologist Dr. Ahmad Agha in June 2014 when he presented for a sleep consultation. (R. 342-43.) Claimant complained of excessive daytime sleepiness, weight gain, snoring, witnessed apnea, and decreased energy. (R. 342.) Claimant told Dr. Agha that he sleeps from 10:00 p.m. to 4:00 a.m. and takes a daily nap. (*Id*.) He denied

cataplexy.[3]  (*Id*.)  A physical examination was unremarkable.  (*Id*.)  Dr. Agha referred Claimant

for a sleep study because his symptoms were "suggestive of obstructive sleep apnea."  (R. 343.)

In August 2014, Claimant underwent a full night polysomnography ("PSG") and a multi-

latency sleep test ("MLST").  The PSG revealed no evidence of obstructive sleep apnea, but did

show severe bradycardia (*i.e.*, low heart rate) and mild periodic limb movements.  (R. 349, 387.)

Dr. Agha recommended further evaluation with a cardiologist.  (R. 387.)  The MLST revealed

severe hypersomnia indicative of narcolepsy.  (R. 385.)  Dr. Agha also noted sleep talking and

hallucinations.  (R. 347.)  Dr. Agha prescribed Provigil and advised Claimant to avoid driving.

(*Id*.)  Claimant followed up with Nurse Hushaw in September 2014 and reported that his

insurance did not cover Provigil.[4]  (R. 423-25.)

By November 2014, Dr. Agha had started Claimant on Ritalin, but he was "still sleepy."

(R. 349.)  According to Dr. Agha's notes, Claimant wakes up at 8 a.m., takes Ritalin, takes a nap

for 30 minutes, goes back to sleep at 5:00 p.m., and then is "jumping at night."  (*Id*.)  Dr. Agha

again recommended Provigil.  (*Id*.)  In February 2015, Dr. Agha indicated that Claimant was

"very limited with medication choices due to insurance" and again noted that Claimant had been

denied coverage for Provigil.  (R. 361.)  Claimant continued to complain that Ritalin only helped

for a couple of hours, after which he would get "sleepy again."  (*Id*.)  On physical exam, Dr.

---

[3]  Cataplexy is a sudden loss of muscle tone, which can cause a number of physical changes, from slurred
speech to complete weakness of most muscles, and may last up to a few minutes.  Some people with
narcolepsy experience only one or two episodes of cataplexy a year, while others have numerous episodes
daily.  Not everyone with narcolepsy experiences cataplexy.  *Narcolepsy*, Mayo Clinic,
https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497 (last visited
October 7, 2019).

[4]  The September 2014 visit is the only time Nurse Hushaw addressed Claimant's narcolepsy.  During the
relevant time period, Claimant saw Nurse Hushaw on a few more occasions for general health issues,
such as bronchitis, skin problems, allergies, and asthma.  (R. 411-22.)  On each visit, Claimant reported
that he exercised and had "active hobbies."  (*Id*.)  Each of Nurse Hushaw's mental status exams showed
Claimant had no psychomotor, mood, affect, speech, or thought impairments.  (*Id*.)

Agha noted decreased breath sounds.  (362.)  Dr. Agha recommend Nuvigil, which "should be approved per insurance."  (*Id*.)  Dr. Agha advised Claimant to "stick to routine," exercise, and to avoid driving, alcohol, and nicotine.  (*Id*.)  Dr. Agha did not add any notable treatment notes at a follow-up visit in April 2015.  (R. 390-92.)

Claimant did not return to see Dr. Agha again until February 29, 2016.  (R. 393-94.) Claimant was still taking Nuvigil.  (R. 394.)  Claimant told Dr. Agha he usually goes to bed at 10:00 p.m., wakes up at 7:00 a.m., takes Nuvigil, and then "sleep[s] in the car."  (*Id*.)  He gets home at 5:00 p.m. and takes another nap at 7:00.  (*Id*.)  Dr. Agha increased Claimant's Nuvigil dosage, prescribed Effexor for hallucinations, and recommended that Claimant try not to nap. (*Id*.)  In October 2016, Claimant told Dr. Agha the Effexor had helped and he was "doing better."  (R. 397.)

### 2. Evidence from Claimant's School Records

Claimant's high school records reveal he took general education classes but received special education services for a "learning disability [that] adversely affects basic reading skills, reading comprehension, math calculation, math problem solving and written expression."  (R. 225.)  The special education services included sitting with a peer tutor when a teacher presented new material, the ability to retake tests in the resource room, and a reduced number of homework problems.  (R. 320.)  In ninth grade, Claimant took the Wide Range Achievement Test and earned the following grade equivalent scores: Word Reading 2.4, Sentence Comprehension 4.1, Spelling 2.8, Math Computation 4.5.  (R. 304.)  Claimant obtained a composite score of 98 on the Reynolds Intellectual Assessment Scales, placing his cognitive abilities within the average

range.[5]  (R. 286.)  In tenth grade, Claimant failed all five sections of the Alabama high school graduation exam.  (R. 314.)  Some of Claimant's twelfth grade teachers commented that he had difficulty staying awake in class.  (R. 229.)  Notwithstanding his challenges, Claimant graduated from high school.  (R. 51-52.)

### 3.    Evidence from Agency Consultants

State agency medical consultant Dr. Richard Bilinsky completed a residual functional capacity assessment on January 15, 2015.  (R. 66-79.)  After reviewing the record, Dr. Bilinsky concluded that although Claimant had no exertional limitations, he could only occasionally climb ramps and stairs, never ladders, ropes, and scaffolds, and must avoid even moderate exposure to hazardous machinery and unprotected heights due to his narcolepsy.  (R. 69-70, 76-77.)  On July 24, 2015, at the reconsideration level, Dr. Leah Holly affirmed Dr. Bilinsky's findings, but added that Claimant must avoid driving in the workplace.  (R. 80-91, 100-02.)

Also at the reconsideration level, psychologist Erika Gilyot-Montgomery conducted a psychiatric review technique to determine the effects of Claimant's mental impairments, if any.  (R. 87-88, 98-99.)  After reviewing Claimant's medical and school records, Dr. Montgomery concluded that Claimant did not have a medically determinable mental impairment, and further noted that Claimant had not alleged any such impairment in his applications.  (R. 88, 99.)  In Dr. Montgomery's opinion, Claimant's documented learning disability resulted in a mild cognitive impairment, "improving with academic support," which caused no more than mild limitations in sustained concentration, pace, stress tolerance, and adaptability.  (*Id.*)

---

[5]  The Reynolds Intellectual Assessment Scales is an intelligence test used to measure verbal and non-verbal intelligence.  Scores between 85 and 115 are considered average.  *See Reynolds Intellectual Assessment Scales,* https://iqtestprep.com/reynolds-intellectual-assessment-scales/ (last visited October 7, 2019).

On January 22, 2015, Claimant's counsel submitted a request for a consultative psychological evaluation due to a history of special education services. (R. 322.) Counsel reiterated this request in his pre-hearing brief to the ALJ. (R. 327-29.) The Social Security Administration never conducted a psychological evaluation and the ALJ expressly denied the renewed request in her opinion. (R. 15.)

### C.    Evidence from Claimant's Testimony

Claimant appeared with counsel at the December 7, 2016 hearing and testified as follows. Claimant is a high school graduate who, at the time of the hearing, resided with his grandparents and younger cousins. (R. 49, 51-52.) Claimant confirmed that his narcolepsy was the only health impairment he wished to discuss at the hearing. (R. 44.)

When asked about his narcolepsy, Claimant testified that he "always had problems with sleeping," but that his symptoms "got bad" in 2014 during his senior year of high school. (R. 45.) He explained that he fell asleep "multiple times a day," sleeping through most of his classes, on the bench during basketball games, and once while driving in May 2014, which led to an accident. (*Id*.) It was at that point Claimant saw a doctor and was put on medication. (R. 46.) At the time of the hearing, Claimant was taking Provigil, though he had started "to get immune to it." (*Id*.) He had similar problems in the past with Ritalin and Adderall. (R. 52.) His doctor tried to start him on Nuvigil, but Medicaid would not cover it. [6] (R. 48.) Other than trying different medications, Claimant's doctors did not have any other plans for treatment. (R. 52-53.)

On a typical day, Claimant wakes up around 7:00 a.m., helps get his younger cousins ready for school, and then takes a walk outside, at times up to 20 blocks. (R. 47, 51.) After about an hour of being awake, Claimant gets drowsy and needs to take a nap. (*Id*.) He'll wake

---

[6] Claimant seems to have confused Nuvigil and Provigil at the hearing. As explained above, contemporaneous medical records reveal that Claimant's insurance company denied coverage for Provigil but approved coverage for Nuvigil. (R. 362, 394, 423-25.)

up after an hour and then the cycle continues. (*Id*.) He usually falls asleep about six times a day. (R. 49.) Apart from getting his cousins ready for school, Claimant also sweeps and vacuums the floors, cleans the bathrooms, cleans up after his cousins, and cares for the family dogs. (R. 50-51.) Claimant typically goes to bed at 9:00 p.m. and sleeps through the night. (R. 49.)

According to Claimant, now that he's on medication, he can usually tell when he's going to fall asleep, because he starts to shake, and his eyesight gets blurry. (R. 47-48.) In Claimant's words, it's as if his "body is shutting completely down; like [he] can't do anything." (R. 48.) Claimant testified that he has fallen asleep while engaged in activities. (R. 53.)

Claimant also described his past work. For two to three months during the summer of 2016, Claimant worked for a friend's landscaping company performing general yard work. (R. 39-40.) Although he worked eight-hour days, Claimant testified that a lot of those hours were spent sleeping in the car. (R. 40.) Claimant was fired after he fell asleep while putting a lawn mower on a truck. (R. 42, 53.) Next, Claimant worked part-time (five hours, three days a week) at a local tire shop. (R. 41-42.) Business was slow so Claimant spent "most of the time" asleep in the back of the shop. (R. 41.) Claimant only worked at the tire shop for three weeks before it went out of business. (R. 43.) Claimant applied for a job at a BMW factory through a temp agency, but was denied employment due to concerns he would fall asleep. (R. 43.)

### D. Evidence from the Medical Expert's Testimony

Dr. Sai Nimmagadda, a pediatrician who specializes in allergies, immunology, and pulmonary medicine, reviewed the file and appeared by phone at the hearing as a medical expert ("ME").[7] The ME first testified that the record supports a finding that Claimant suffers from the severe impairment of narcolepsy. (R. 55.) The ME did not believe that Claimant met or equaled

---

[7] At the time of the hearing, the record did not include any of Dr. Agha's treatment records after February 2015. (R. 35.)

a listing. (R. 56.) Specifically, the ME explained that there is no longer a listing for narcolepsy, but that it is often considered under listing 11.02 for epilepsy, which Claimant did not meet. (R. 55-56.)

Next, the ALJ asked the ME what functional limitations Claimant would have as a result of his narcolepsy. (R. 56.) According to the ME, Claimant would have no exertional limitations, but could climb ramps and stairs occasionally; never ladders, ropes or scaffolds; could frequently balance, stoop, kneel, crouch, and crawl; and must avoid all dangerous machinery, unprotected heights, and commercial driving. (R. 57.)

Upon questioning by Claimant's counsel, the ME testified that the record did not show the frequency of Claimant's episodes as Claimant described them. (R. 57.) Generally speaking, however, the ME confirmed that Claimant's reported symptoms are consistent with his condition because individuals with narcolepsy will "often times have daytime somnolence" and "daytime episodes where they will fall asleep or have periods where they are unresponsive or…tired through the day." (R. 57-58.) When asked if he had an opinion about how such episodes might affect someone's concentration, persistence, and pace, the ME explained that the effects would be variable with some days being worse than others. (R. 58.) The ME agreed, however, that the episodes would have "some negative impact" on concentration, persistence, pace, and on-task time. (*Id.*) But, in the ME's opinion, Claimant may not have tried all the medications available for treating narcolepsy and there could be potential for improvement. (*Id.*)

### E.     Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony at the hearing. The VE first agreed that Claimant did not have any prior relevant work. (R. 59.) Next, the ALJ asked the VE to consider a hypothetical individual of the claimant's age, education, and experience who had no

exertional work limitations, but who could only occasionally climb ramps and stairs, never ladders or scaffolds; could frequently balance, stoop, kneel, crouch and crawl; must avoid workplace hazards, including unprotected heights, moving machinery, and operating a motor vehicle; and who was further limited to simple, routine tasks and simple work-related decisions. (R. 59-60.)  The VE explained that such an individual could perform work as a housekeeper/cleaner (light, unskilled), laundry laborer, or transportation cleaner/cleaner II (both medium, unskilled).  (R. 60-61.)

The VE further explained that an individual working in the representative positions would typically be permitted to take one 30-minute meal break, two additional 10-minute breaks, and two bathroom breaks, as needed.  (R. 61.)  Generally speaking, employers tolerate up to ten-percent off task time per hour, and up to ten absent days per year.  (*Id*.)  According to the VE, work would be precluded for an individual who required a break once per hour or unpredictable breaks throughout the day.  (R. 61-62.)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015).  Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.' " *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ has articulated "an accurate and logical bridge" from the evidence to his/her conclusion. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate [his or her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

### B.      The Standard for Proof of Disability Under The Social Security Act

In order to qualify for CDIBs or SSI, a claimant must be "disabled" under the Act. [8] A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful

---

[8]  The Court notes that the Claimant applied for child's disability insurance benefits after he turned eighteen.  "An individual over eighteen is eligible for child benefits if the disability began before he

activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

### C.    The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. Before doing so, however, the ALJ denied Claimant's request for a consultative psychological exam and intelligence testing, finding that the Claimant's learning disability was well documented in his high school records. (R. 15.) The ALJ also noted that the school records included intelligence testing that showed Claimant's

---

turned twenty-two." *Dixon v. Colvin*, No. 14 C 321, 2015 WL 8780550, at *6 (N.D.Ind. Dec. 15, 2015) (citing 20 C.F.R. § 404.350(a)(5)). Where, as here, a claimant files for child's benefits after he turned eighteen and alleges an onset date after he turned eighteen, the Commissioner applies the disability rules used for adults who file new claims. *See Dixon*, 2015 WL 8780550, at *6 (citing 20 C.F.R. § 416.924(f)).

"intellectual functioning is in the normal range." (*Id*.) Additionally, the ALJ found that there was no indication that Claimant "was diagnosed or treated for a mental impairment after his alleged onset date." (*Id*.) As such, the ALJ closed the record and proceeded to the five-step inquiry under the Act.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset date of July 1, 2014. (R. 17-18.) Next, at step two, the ALJ determined that Claimant suffered from the severe impairments of recurrent hypersomnia and narcolepsy. (R. 18.) The ALJ found that Claimant's bradycardia and learning disability were not severe because they did not cause more than minimal limitations in Claimant's ability to perform basic work activities. (R. 18-19.) At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, after "paying particular attention" to listings 3.02 (chronic respiratory disorders) and 11.02 (epilepsy). *See* 20 C.F.R. Part 404, Subpart P, App. 1.

The ALJ went on to assess Claimant's RFC, ultimately concluding that he had the RFC to perform a full range of work at all exertional levels, with certain non-exertional limitations. (R. 20.) Specifically, the ALJ found that Claimant could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and must avoid workplace hazards, including unprotected heights, moving mechanical parts, and operating motor vehicles. (*Id*.) The ALJ further limited Claimant to simple, routine tasks and simple work-related decisions. (*Id*.) At step four, the ALJ determined that Claimant had no past relevant work. (R. 24.) Lastly, at step five, the ALJ concluded that given Claimant's age, education, and RFC, he could perform jobs that exist in significant numbers in the national economy, including the representative occupations of housekeeper/cleaner, laundry laborer, and

transportation cleaner.  (R. 25.)  As such, the ALJ found that Claimant was not under a disability from his alleged onset date through the date of her decision.  (R. 26.)

### D.     The Parties' Arguments in Support of their Respective Motions for Summary Judgment.

In his motion for summary judgment, Claimant first argues that the ALJ failed to properly consider the functional effects of Claimant's narcolepsy and recurrent hypersomnia in assessing his RFC.  According to Claimant, the ALJ failed to account for the "day-to-day bouts of overwhelming fatigue in which [Claimant's] body simply shuts down" and the effect of [Claimant's] somnolence and fatigue on his reliability in the workplace."  (Dkt. 17 at 10.)  Next, Claimant argues that the ALJ's assessment of his subjective symptoms was flawed because it was improperly based solely on a lack of objective medical evidence and factual inaccuracies. Lastly, Claimant argues that the ALJ erred in denying Claimant's request – made in January 2015 and in a pre-hearing brief – for a consultative psychological evaluation with IQ testing.

In response, the Commissioner points out that the ALJ gave great weight to every medical opinion of record when assessing Claimant's RFC and that there were no medical opinions endorsing greater functional limitations than those found by the ALJ.  According to the Commissioner, the ALJ also properly assessed Claimant's subjective symptoms in the context of the record as a whole, giving careful consideration to his treatment records, his daily activities, and his own contemporaneous statements.  Finally, the Commissioner argues that the ALJ acted within her discretion in denying Claimant's request for psychological testing.  The Court agrees with the Commissioner on all counts.

### E.     The ALJ's RFC Assessment is Supported by Substantial Evidence.

Claimant argues that the ALJ erred in assessing his RFC by failing to account for his day-to-day bouts of fatigue and the effect such fatigue would have on his reliability in the workplace.

"The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the [ALJ] must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; medical source statements; effects of the claimant's symptoms; the reports of activities of daily living ("ADL"); and evidence from attempts to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In this case, the ALJ engaged in a thorough and requisite review of the evidence, including Claimant's medical history, treatment history, daily activities, and work history. (R. 22-24.); *see* SSR 96-8p, 1996 WL 374184, at *5. Other than his own symptom statements – which we discuss below – Claimant has not pointed to any evidence in the record that he contends that the ALJ failed to consider when assessing his RFC.

The Court finds for the following reasons that the ALJ's RFC is supported by substantial evidence.

### 1. The ALJ properly accounted for Claimant's limitations by considering and crediting every medical opinion in the record.

The record shows that the ALJ considered and credited *all* of the medical opinions of record, including those of Claimant's treating physicians. Indeed, both Dr. Agha and Nurse Hushaw recommended that Claimant should avoid driving and the ALJ properly included that limitation in the RFC. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions…Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance

and may be entitled to controlling weight."). Similarly, the ALJ properly credited the opinions of the reviewing state agency consultants and the ME, who also opined that Claimant must avoid commercial driving and workplace hazards, among other postural and task-based limitations ultimately adopted by the ALJ. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."). All of these physicians were aware of Claimant's narcolepsy and any related effects on his ability to work, and the ALJ properly considered and afforded their opinions a considerable amount of weight.

Claimant has not – and, based on the Court's review of the record, cannot – identify any "medical opinion that imposed RFC restrictions greater than those imposed by the ALJ." *Johnson v. Berryhill*, No. 18 C 1395, 2018 WL 5787121, at *8 (N.D.Ill. Nov. 5, 2018). This is significant because courts within this Circuit have repeatedly held that "[t]here is no error" in the formulation of an RFC "when there is 'no doctor's opinion contained in the record [that] indicates greater limitations than those found by the ALJ.'" *Best v. Berryhill,* 730 Fed.Appx. 380, 382 (7th Cir. 2018)*, quoting Rice v. Barnhart,* 384 F.3d 363, 370 (7th Cir. 2004); *Davis v. Berryhill,* 723 Fed.Appx. 351, 356 (7th Cir. 2018) (same); *Patricia B. v. Berryhill,* No. 17 CV 50201, 2019 WL 354888, at *4 (N.D.Ill. Jan. 29, 2019) (same); *Jodi L. v. Berryhill,* No. 17 CV 50235, 2019 WL 354962, at *4 (N.D.Ill. Jan. 29, 2019) (same). This Court agrees with this authority and it further finds that the cases cited by Claimant are distinguishable. [9]

---

[9] For example, in *Converse v. Apfel*, the ALJ improperly ignored specific restrictions identified by a psychiatrist that might limit Claimant's ability to maintain competitive employment. 144 F.Supp.2d 1045, 1050-51 (N.D.Ind. 2000). Claimant has identified no such findings by the treating or reviewing physicians here. And, although the ME acknowledged on cross-examination that narcolepsy could cause problems with concentration or pace in the workplace, the ME did not include further restrictions in his recommended RFC. (R. 57-58.)

## 2.  The ALJ properly considered Claimant's subjective symptoms.

Claimant takes issue with the ALJ's assessment of his reported subjective symptoms, namely his complaints of falling asleep unexpectedly and as frequently as six times a day.  The ALJ must sufficiently explain her evaluation of a claimant's subjective symptoms "by discussing specific reasons supported by the record."  *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).  The ALJ's discussion must allow a reviewing Court "to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."  *McKinzey*, 641 F.3d at 890.  The Court will only overturn the ALJ's subjective symptom assessment if it is "patently wrong," that is, lacking "any explanation or support."  *Elder*, 529 F.3d at 413.

Social Security Ruling ("SSR") 16-3p provides additional guidance to the ALJ for assessing the Claimant's symptoms.[10]  SSR 16-3p calls for a two-step process whereby the ALJ first determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms.  SSR 16-3p, 2017 WL 4790249, *49463.  Next, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  *Id*. at 49464.  In making this evaluation, the ALJ should consider the entire case record, along with (1) the claimant's daily activities; (2) location,

---

[10] Because the ALJ issued her ruling after March 28, 2016, SSR 16-3p, which superseded SSR 96-7p, applies here.  *See* SSR 16-3p, 82 FR 49462-03, 2017 WL 4790249, n.27.  SSR 16-3p shifted the focus from a claimant's credibility to clarify that "subjective symptom evaluation is not an examination of the individual's character" but is instead entails a careful application of "regulatory language regarding symptom evaluation."  *Id*. at 49463; *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (noting that ALJs are not "in the business of impeaching claimants' character").  Nonetheless, SSR 96-7p and SSR 16-3p "are not patently inconsistent with one another," and a "comparison of the two Rulings shows substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms."  *Shered v. Berryhill*, No. 16 CV 50382, 2018 WL 1993393, at *5 (N.D.Ill. Apr. 27, 2018).

duration, frequency, and intensity of pain or symptoms; (3) precipitation and aggravating factors; (4) type, dosage and side effects of medication; (5) treatment other than medication; and (6) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at 49465-66; 20 CFR § 404.1529(c)(3).

The ALJ followed this two-step process here, first determining that Claimant's narcolepsy could reasonably be expected to cause Claimant's reported symptoms. But, at the second step, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21.) The rationale that the ALJ provided for this finding allows this Court to conclude that the ALJ reached her decision in a rational matter that was supported by the evidence of record. *McKinzey*, 641 F.3d at 890.

First, after properly reviewing Claimant's full treatment history, the ALJ found that the "medical record does not support the severity" of Claimant's symptoms. (R. 24.) Specifically, the ALJ commented that although Dr. Agha described Claimant's complaints of daytime fatigue, "there is no indication in his notes or Nurse Practitioner Linda Hushaw's treatment notes that the claimant could only stay awake for an hour before falling asleep again…" (*Id*.) Again, as explained above, though Claimant complained of excessive daytime sleepiness and the need to nap at his visits with Dr. Agha, the treatment notes are inconsistent with his subsequent testimony of falling asleep unpredictably and up to six times a day. It was within the ALJ's prerogative to consider such inconsistencies when assessing the veracity of Claimant's complaints. *See Elder*, 529 F.3d at 413-14 (upholding the ALJ's decision to disregard the claimant's testimony because it contradicted Claimant's previous reports to her doctor); *see*

*also Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration.").

Furthermore, a review of the record refutes Claimant's assertion that the "medical evidence only fails to specify, and does not contradict [Claimant's] reports of the frequency with which his symptoms occur." (Dkt. 17 at 12.) Specifically, Claimant *denied* cataplexic episodes at his first appointment with Dr. Agha and, at future appointments, he described a daily schedule that included one nap - - and not *six* naps - - during regular work hours. Thus, contrary to Claimant's assertion, his contemporaneous reports to his physician were inconsistent with his subsequent testimony to the ALJ, and the ALJ was free to consider those inconsistencies.[11] *See Murphy v. Berryhill*, 727 Fed.Appx. 202, 207 (7th Cir. 2018) ("But the ALJ's adverse credibility finding was not based on the absence of details in her medical records; rather, it was properly based on the incongruity between the relatively modest symptoms [Claimant] reported to her doctors and the more severe symptoms [Claimant]…reported to the ALJ."); *Elder,* 529 F.3d at 414 ("The ALJ clearly provided a reason for his adverse credibility determination: he stated that Elder's testimony regarding the severity of her fibromyalgia and depression contradicted what she told Dr. Ko. The record supports this explanation. . . . [and] [i]t was within the ALJ's authority to disregard Elder's testimony because it conflicted with what she told Dr. Ko"); *Ublish v. Astrue,* No. 11 CV 4359, 2013 WL 80370, at *12 (N.D.Ill. Jan. 7, 2013) (same).

---

[11] Claimant also misconstrues the ME's testimony when he states in his brief that "the medical expert confirmed that [Claimant's] reported symptoms, which include falling asleep on an average of six times during the day, are consistent with his medical condition." (Dkt. 17 at 12.) On the contrary, although the ME testified that claimants with narcolepsy would suffer daytime sleepiness and periods of sleep, the ME explained that he did not see evidence in the record documenting the frequency of symptoms described by Claimant. (R. 57-58.)

To be clear, the ALJ did not discount Claimant's complaints due to a lack of objective medical evidence proving his narcoleptic episodes exist at all. Indeed, as the Commissioner's own internal guidelines explain, "[t]here are no physical abnormalities in narcolepsy, and with the exception of sleep studies, laboratory studies will be normal." SSA Program Operations Manual System ("POMS"), *DI 24580.005 Evaluation of Narcolepsy,* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580005 (Sept. 26, 2016) (last visited October 7, 2019).[12] Rather, the ALJ properly relied on the inconsistency between Claimant's contemporaneous complaints to Nurse Hushaw and Dr. Agha and his subsequent complaints to the ALJ. *Murphy,* 727 Fed.Appx. at 207; *Elder,* 529 F.3d at 414; *see also Cobb v. Saul*, No. 2:18-CV-136-JEM, 2019 WL 4267910, at *4 (N.D.Ind. Sept. 9, 2019) (affirming ALJ's opinion where "the medical record did not corroborate Plaintiff's allegations of constantly falling asleep without control.").

Furthermore, although an ALJ may not discount a claimant's subjective symptoms solely because they are not substantiated by medical evidence, *see* SSR 16-3p, 2017 WL 4790249, *49465, here, the ALJ considered other factors enumerated in SSR-16-3p, including Claimant's daily activities. Specifically, the ALJ cited Claimant's testimony that he helped his younger cousins get ready for school each morning and performed a variety of household chores throughout the day, albeit between his periods of sleepiness. (R. 24.) The ALJ also noted that notwithstanding Claimant's reports that he fell asleep six times a day, his May 2015 function report revealed he still drove a car and rode a bicycle when leaving the house. (R. 24, 263.) The ALJ was free to consider the inconsistencies between Claimant's symptom statements and his daily activities and she did not place an undue weight thereon. *See* 20 C.F.R. § 404.1529; *Craft*

---

[12] Notably, Claimant did not cite this POMS section or attempt to argue that the ALJ failed to follow the guidelines therein.

*v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) ("An ALJ can appropriately consider a claimant's daily activities when assessing his alleged symptoms" as long as she does not place "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.") (citation omitted); *see also Ephrain S.*, 355 F.Supp.3d at 749–50.

Lastly, the ALJ made reasonable inferences based on the evidence, commenting that "there is no indication in the medical record that the claimant had ever sought or received treatment for acute injuries from falls despite his reports of falling asleep at home and while working as a landscaper." (R. 24); *compare Collord v. Heckler*, 633 F.Supp. 902, 906 (N.D.Ill. 1986) (noting that reports from claimant's treating physican "confirmed that plaintiff suffers from continuous [narcoleptic] attacks all through the day, causing plaintiff many minor injuries, *e.g.* cuts, burns and pulled muscles."). The ALJ also commented that "if the claimant was in fact falling asleep six times a day as he testified, he would have been fired from his job as a landscaper well before he completed three months of work." (R. 24.) Based on the record as a whole, the ALJ's inferences are reasonable and serve as additional support for the ALJ's subjective symptom assessment. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before her). [13]

---

[13] Claimant faults the ALJ's reliance on his three-month landscaping job and claims that the ALJ ignored his testimony that he slept in the car for most of the day and the fact that even a family friend fired him for sleeping on the job. This Court, however, finds that it was reasonable for the ALJ to reject Claimant's testimony that he slept for most of the day based on her inference that Claimant would have been fired long before three months had passed if he had actually done so. In any event, "an ALJ's credibility assessment and ultimate determination need not be perfect" so long as the determination is not patently wrong and it has "some support" in the record. *Mueller v. Astrue*, 860 F.Supp.2d 615, 631 (N.D. Ill. 2012), *aff'd sub nom. Mueller v. Colvin*, 524 Fed.Appx. 282 (7th Cir. 2013) (internal citations and quotations omitted). For the reasons already explained, such support is evident here.

In sum, the ALJ properly considered the Claimant's subjective symptoms and her assessment will not be disturbed because it is not patently wrong. *Elder*, 529 F.3d at 413.

### 3. The ALJ's failure to explore the reason why Claimant failed to seek more frequent follow-up care was harmless error.

The ALJ also noted and drew a negative inference from the fact that Claimant did not follow-up with Dr. Agha until February 2016 and received treatment "on just three occasions in 2016 despite his reports of a debilitating sleep disorder" that progressively got worse after April 2015. (R. 24.)  Although the regulations expressly permit the ALJ to consider a claimant's treatment history, 20 C.F.R. § 404.1529(c)(3)(v), the ALJ – as Claimant asserts – drew a negative inference from Claimant's failure to seek more frequent treatment without first exploring his reasons for not doing so.  This was error, particularly given that the ALJ was aware of a possible reason (namely, that Claimant's insurer would not authorize payment for Provigil – the medication that Claimant's physician repeatedly recommended (R.22)) why Claimant might have felt that more frequent treatment would have been futile notwithstanding his worsening symptoms. *See Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012).

However, an "administrative error may be harmless" and courts "will not remand a case to the ALJ for further specification where [they] are convinced that the ALJ will reach the same result." *McKinzey,* 641 F.3d at 892.  In this case, this Court is convinced that the ALJ would reach the same result given her formulation of Claimant's RFC and her otherwise appropriate assessment of Claimant's subjective symptoms even if the case were remanded for a consideration of why Claimant did not seek more frequent medical treatment after April 2015. Consequently, the Court finds that the ALJ's error with respect to this issue was harmless. *See, e.g., Kittelson v. Astrue,* 362 Fed.Appx. 553, 558 (7th Cir. 2010) (finding harmless error despite the fact that the ALJ drew a negative inference from a claimant's failure to seek additional

medical treatment without first considering explanations for the failure); *Donald L. v. Saul,* No. 18 CV 5734, 2019 WL 3318165, at *6-7 (N.D.Ill. July 24, 2019) (same); *Baker ex rel. C.S.A. v. Astrue,* No. 1;11-CV-00592-WTL, 2012 WL 3779213, at *6 (S.D.Ind. Aug. 31, 2012) (same).

### F. The ALJ's Denial of Claimant's Request for a Consultative Psychological Exam and Intelligence Testing Does Not Require Remand.

Finally, Claimant argues that the ALJ erred by denying his request for a consultative psychological exam and intelligence testing. Again, the ALJ denied Claimant's request because (1) his learning disability was well-documented in the school records; (2) previous intelligence testing showed intellectual functioning in the normal range; and (3) Claimant was never diagnosed or treated for a mental impairment after his alleged onset date. (R. 15.)

Claimant is correct that the ALJ has a duty to develop a full and fair record. *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). But the ALJ's obligation is not limitless and reviewing courts defer to the ALJ's reasoned judgment as to when further inquiry is warranted. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *see also Skarbek*, 390 F.3d at 504 ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.") Furthermore, an ALJ is "not *required* to order [consultative] examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient." *Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir. 2007) (emphasis in original). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

Here, the ALJ's reasoning was sound and Claimant has failed to show how the record before the ALJ was inadequate. First, as the ALJ explained, Claimant's learning disability was well-documented in school records, which both the ALJ and the agency psychologist reviewed and properly considered. Although Claimant argues that further testing might explain the

discrepancy between his normal range IQ and his low achievement in school, such speculation is insufficient to warrant remand where the record before the ALJ was otherwise adequate to assess Claimant's condition.  *See, e.g., Skinner*, 478 F.3d at 844.

Second, Claimant did not initially seek disability benefits for any mental health related issues, nor did he describe any symptoms at the hearing – when he was represented by counsel – alluding to such issues.  *See Skinner*, 478 F.3d at 842 ("A claimant represented by counsel is presumed to have made his best case before the ALJ").  In fact, when the ALJ asked Claimant if there were any other health problems he wished to discuss besides narcolepsy, he responded, "No."  (R. 44.)

Lastly, Claimant cites to the few occasions when Claimant complained of hallucinations to Dr. Agha, arguing that a psychological evaluation would provide more information about those hallucinations.  But, as the Commissioner points out, those complaints came in the context of Claimant's treatment for narcolepsy and thus appear to refer to "hypn[a]gogic hallucinations (vivid dreams that a person gets in Narcolepsy)."  *Floress v. Massanari*, 181 F.Supp.2d 928, 934–35 (N.D.Ill. 2002); *see also What are hypnagogic hallucinations?* Medical News Today, https://www.medicalnewstoday.com/articles/321070.php (last visited October 7, 2019).  More importantly, Dr. Agha prescribed Effexor and, by October 2016, Claimant reported decreased hallucinations and said he was "doing better."  (R. 397.)  And, again, Claimant did not complain of hallucinations interfering with his ability to work at the hearing.

In sum, where, as here, the "record contained adequate information for the ALJ to render a decision," the ALJ was not required to order a consultative psychological examination or further intelligence testing.  *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018) (citing *Skinner*, 478 F.3d at 843-44).

## III.  CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's opinion is supported by

substantial evidence.  Accordingly, Claimant's motion for summary judgment (Dkt. 17) is denied

and the Commissioner's motion for summary judgment (Dkt. 25) is granted.  It is so ordered.


ENTERED:

**Jeffrey I. Cummings**
**United States Magistrate Judge**

**Dated: November 1, 2019**